UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 19-25252-CV-COOKE/O'SULLIVAN

JULIE WINES,

      Plaintiff,

v.

ANDREW SAUL,
Commissioner of Social Security,

      Defendant.
_____/

## <u>REPORT AND RECOMMENDATION</u>

THIS MATTER is before the Court on the Plaintiff's Motion for Summary Judgment (DE # 25, 09/28/2020) and the Defendant's Motion for Summary Judgment (DE # 26, 10/28/2020). The plaintiff seeks reversal of the Social Security Administration's ("SSA") denial of Disability and Disability Insurance Benefits ("DIB"). The complaint was filed pursuant to the Social Security Act, 42 U.S.C. § 405(g), and is properly before the Court for judicial review of a final decision of the Commissioner of the SSA. This matter was referred to the undersigned pursuant to 28 U.S.C. § 636(b) by the Clerk's Notice of Judicial Assignment (DE # 2, 12/21/19). Having carefully considered the filings and applicable law, the undersigned recommends that the Plaintiff's Motion for Summary Judgment (DE # 25, 09/28/2020) be **DENIED** and the Defendant's Motion for Summary Judgment (DE # 26, 10/28/2020) be **GRANTED** in accordance with the following Report and Recommendation.

**PROCEDURAL HISTORY**

On October 13, 2006, Julie Wines (hereinafter "plaintiff" or "claimant") filed an application for a period of disability and disability insurance benefits (DIB). (Tr. 316-19).[1] On December 21, 2015, the plaintiff filed an application for supplemental security income (SSI). (Tr. 320-26).

The plaintiff's claims were initially denied on April 15, 2016, (Tr. 120-23), and denied after reconsideration on July 21, 2016. (Tr. 171-75).

On October 20, 2016, the Office of Disability Adjudication and Review wrote a letter to the plaintiff informing her they had received her request for a hearing before an Administrative Law Judge ("ALJ"). (Tr. 183-85). The hearing was held before the ALJ on September 21, 2018. (Tr. 31-80). The plaintiff testified at the hearing and was represented by counsel. (Tr. 43-70). A vocational expert also testified at the hearing. (Tr. 70-78).[2]

On December 6, 2018, the ALJ issued his decision. (Tr. 15-24). The ALJ determined that the plaintiff was not under a disability within the meaning of the Social Security Act from December 21, 2015, through the date of the decision because the plaintiff still had the residual functional capacity ("RFC") to perform jobs that existed in significant numbers in the national economy. (Tr. 22-23). The ALJ's decision became

---

[1] All references to "Tr." refer to the transcript of the Social Security Administration record filed July 9, 2020. See Social Security Transcript (DE # 20, 7/9/2020). The page numbers listed on this document refer to the bold numbers found in the lower right-hand corner of each page on the transcript, as opposed to those assigned by the Court's electronic docketing system or any other page number.

[2] A VE "is an expert on the kinds of jobs an individual can perform based on his or her capacity and impairments." Phillips v. Barnhart, 357 F.3d 1232, 1240 (11th Cir. 2004).

final on November 20, 2019, when the Appeals Council denied the plaintiff's request for review. (Tr. 1-6).

The plaintiff filed the instant action on December 21, 2019 seeking a reversal of the SSA's decision. See Amended Complaint (DE # 1, 12/21/2019).[3] The parties filed cross-motions for summary judgment. See Plaintiff's Motion for Summary Judgment (DE # 25, 09/28/2020) ("Pl.'s Br."); Defendant's Motion for Summary Judgment (DE # 26, 10/28/2020) ("Def.'s Br.").

This matter is ripe for adjudication.

## **FACTS**

### I.     **Plaintiff's Age, Education, and Work Experience**

The plaintiff was born on February 27, 1966, (Tr. 316), and was 52 years old on the date of the ALJ's decision. The plaintiff completed high school and worked as a telemarketer prior to her alleged disability onset date of December 21, 2015.[4] (Tr. 44-49, 355). The plaintiff has not worked since approximately June 2011. (Tr. 355, 361).

---

[3] There is no initial complaint. The first document on the docket is the Amended Complaint (DE # 1, 12/21/2019).

[4] On the day of the hearing before the ALJ, the plaintiff's counsel amended the plaintiff's disability onset date from January 1, 2006 to December 21, 2015. (Tr. 76-77; 316). Thus, for the purposes of Social Security disability, the plaintiff claims she has been disabled since December 21, 2015.

## II.     Summary of Medical Evidence

The plaintiff's relevant medical history is as follows.

### A.     Palmetto General Hospital

From January 16, 2016 through January 19, 2016, the plaintiff was hospitalized at Palmetto General Hospital for alcohol intoxication and mood disorder, not otherwise specified. (Tr. 831-51). The plaintiff reported paranoid thoughts and suicidal thoughts at the time of admission but was not suicidal during her hospital stay and did not voice dangerous thoughts or thinking. (Tr. 832-33). The plaintiff had a blood alcohol level of 171.9, had a negative toxicology screen, and felt she was detoxing. (Tr. 832). The medical providers at Palmetto General Hospital found "no objective findings or signs of alcohol detox[ification]." (Tr. 833). The plaintiff was discharged on January 19, 2016 and told to follow up with her psychiatrist. Id.

### B.     David Echavarria, Ph.D.

On March 10, 2016, the plaintiff saw David Echavarria, Ph.D., a licensed psychologist, for a longitudinal diagnostic mental health evaluation. (Tr. 857-59). Dr. Echavarria diagnosed the plaintiff with major depressive disorder, recurrent; anxiety disorder; "[r]ule out" posttraumatic stress disorder; and a history of alcohol and substance abuse. (Tr. 858). Dr. Echavarria described the plaintiff has having "a homeless appearance" and reported that the plaintiff was "fairly kept with fair grooming and hygiene." Id. The plaintiff presented as highly anxious during the interview. Id. Nonetheless, Dr. Echavarria noted that the plaintiff was able to perform mental calculations such as simple addition and subtraction and recite six digits forward and

three digits backward. Id. Dr. Echavarria described the plaintiff's mood as anxious and depressed, but he did not objectively find psychosis or paranoia. Id.

### C.   State Agency Reviews

In April 2016, Judith E. Meyers, Psy.D., a psychological consultant, conducted an initial state agency review of the plaintiff's alleged mental impairments. (Tr. 100-02, 105-06). Dr. Meyers opined that the plaintiff's affective disorder and anxiety-related disorder caused mild restriction of activities of daily living, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. (Tr. 101). Dr. Meyers also opined that the plaintiff was not significantly limited in her ability to understand and remember very short and simple instructions or to carry out very short and simple instructions. (Tr. 105).

On April 15, 2016, Nadege Claubert, a single decision maker (SDM),[5] conducted an initial state agency review of the plaintiff's alleged physical impairments. (Tr. 103-05). According to SDM Claubert, the plaintiff is able to lift and/or carry up to 20 pounds occasionally and 10 pounds frequently. (Tr. 103). The plaintiff was also able to stand and/or walk and sit for approximately six hours in an eight-hour workday. (Tr. 103-04).

On July 5, 2016, James Mendelson, Ph.D., a licensed psychologist, conducted a second state agency review of the plaintiff's alleged mental impairments. (Tr. 134-36, 146-51). Dr. Mendelson opined that the plaintiff "retain[ed] the ability to perform simple, repetitive tasks, with limited social contact." (Tr. 151). He further opined that the plaintiff

---

[5] "SSA's Single Decisionmaker (SDM) model authorizes disability examiners to make certain initial determinations without requiring a medical or psychological consultant's signature." https://oig.ssa.gov/audits-and-investigations/audit-reports/A-01-12-11218, last visited, June 22, 2021.

was "able to meet the basic mental demands of work on a sustained basis, despite any limitations resulting from identified [Medically Determinable Impairments ('MDI')]." Id.[6]

Audrey Goodpasture, M.D. reviewed the plaintiff's records in July 2016 and found no evidence of severe physical problems that affected function. (Tr. 130).

### D.   Westchester General Hospital

From May 9, 2016 through May 11, 2016, the plaintiff was hospitalized at Westchester General Hospital. (Tr. 860-82). On the date of admission, the plaintiff's blood alcohol level was 238. (Tr. 861). The plaintiff reported that she had consumed five alcoholic drinks[7] and used crack cocaine earlier that day. (Tr. 861). The plaintiff's admission diagnoses included psychiatric exacerbation with suicidal ideation, alcohol intoxication and drug abuse. (Tr. 862). At the time of her discharge, the plaintiff was diagnosed with acute alcohol intoxication, elevated liver function tests most likely due to alcohol consumption, drug abuse, and psychiatric exacerbation with suicidal ideation. (Tr. 861).

### E.   Citrus Health Network

On multiple occasions between April 2017 and September 2018, the plaintiff was treated at Citrus Health Network. (Tr. 984-1121). On May 1, 2017, during a mental examination, the plaintiff exhibited less anxiety and less depressive symptoms than before, fair insight and judgment and poor attention and concentration. (Tr. 1009-10). The plaintiff's memory was grossly intact. (Tr. 1010).

---

[6] The plaintiff's MDIs included affective disorder and anxiety disorder. (Tr. 146).

[7] The plaintiff reported consuming approximately four to five alcoholic drinks per day. (Tr. 861).

On October 9, 2017, during a mental examination, the plaintiff exhibited tearfulness, spoke in a low tone, presented a depressed affect, exhibited increased depressive symptoms with suicidal ideation and plan, exhibited poor insight and judgment, and poor attention and concentration. (Tr. 1007-08).

On November 20, 2017 and January 8, 2018, the plaintiff complained of intermittent anxiety and was concerned about possible panic attacks with palpitations and shortness of breath. (Tr. 1001-05).

On May 14, 2018, during a mental examination, the plaintiff exhibited poor eye contact, tearfulness, depressed affect, circumstantial thought process, depressive symptoms and anxiety, fair insight, poor judgment, and fair attention and concentration. (Tr. 998-99).

On July 9, 2018, the plaintiff reported an overall decrease in alcohol use with a recent relapse. (Tr. 995-97). The plaintiff exhibited fair eye contact, a less depressed affect than before, circumstantial thought process, less depressive symptoms and less anxiety than before, fair insight, poor judgment, and fair attention and concentration. (Tr. 996).

On August 20, 2018, during a mental examination, the plaintiff exhibited cooperative behavior and an organized appearance, fair insight and judgment, fair attention and concentration, good eye contact, clear speech, and less circumstantial thought process than before. (Tr. 992-93).

In addition to the periodic mental examinations described above, the plaintiff had multiple admissions to the crisis stabilization unit at the Citrus Health Network. On October 9, 2017, the plaintiff was admitted to the crisis stabilization unit at Citrus Health

Network due to increased depression, along with passive suicidal thoughts with thoughts of overdosing on pills. (Tr. 1072). On January 29, 2018, the plaintiff was again admitted into the crisis stabilization unit due to suicidal ideation and depressive symptoms. (Tr. 1064-71). On February 12, 2018, the plaintiff was transferred from the crisis stabilization unit to the STAR program. (Tr. 1065). On February 26, 2018, the plaintiff was again admitted into the crisis stabilization unit due to suicidal ideation and depressed symptoms. (Tr. 1043-1044). On May 15, 2018, the plaintiff was once again admitted into the crisis stabilization unit due to depression, anxiety, and frustration with her current living situation. (Tr. 1032-1042).

### F.    Jackson South Community Hospital

On both May 25, 2018 and May 30, 2018, the plaintiff presented to the emergency department at Jackson South Community Hospital. (Tr. 916-48) On May 25, 2018, the plaintiff was diagnosed with acute bronchitis, acute upper respiratory infection, acute urinary tract infection, and atrial fibrillation with rapid atrial fibrillation. (Tr. 941). On May 30, 2018, the plaintiff complained of palpitations and was diagnosed with rapid atrial fibrillation. (Tr. 920, 933).

### III.   Hearing Testimony

As previously noted, a hearing was held before the ALJ on September 21, 2018. (Tr. 31-80). The plaintiff and a vocational expert ("VE") testified at the hearing. (Tr. 43-78).

### A.    Plaintiff's Testimony

At the time of the hearing, the plaintiff was 52 years old and had a twelve-grade education. (Tr. 43). In 2003 and 2004, the plaintiff worked as a telemarketer for a real

estate broker and later a dating service company. (Tr. 44-46). Afterwards, the plaintiff

worked for a short period of time as a telemarketer for a mortgage company. (Tr. 48).[8]

In addition, in 2011, for approximately three months, the plaintiff worked as a

telemarketer for a magazine company as part of a prison work release program[9] with

the state of Florida. (Tr. 48-49).

The plaintiff testified that she was financially dependent on her live-in companion.

(Tr. 49-50). The plaintiff was also financially dependent on her mother who resided in

Maryland. Id. The plaintiff's mother would schedule rides through a ride-hailing company

so that the plaintiff could attend her doctors' appointments. (Tr. 63). The plaintiff also

received government assistance in the form of food stamps. (Tr. 50).

In 2000 or 2001, the plaintiff learned that she had chronic liver disease. (Tr. 51).

The plaintiff had hepatitis C and started chemotherapy treatments in 2002. Id. The

plaintiff reported feeling "[v]ery ill" from the chemotherapy treatments. (Tr. 52). The

plaintiff experienced hair loss and described her symptoms as being akin to "a serious

flu." Id. The plaintiff could not get out of bed for approximately three months and was

"very low energy" afterward. Id.

The plaintiff also stated that she suffered from depression, anxiety, panic

disorder and posttraumatic stress disorder. (Tr. 53). The plaintiff reported seeing a

psychiatrist at the Citrus Health Network since 2012. Id. The plaintiff also reported

seeing a therapist once a week. (Tr. 67).

---

[8] For a "[v]ery short" time, the plaintiff also worked as a telemarketer for a company which sold advertisements. (Tr. 50). It is unclear from the hearing transcript which year the plaintiff worked for this company. Id.

[9] The plaintiff was incarcerated for a year and a half for attempted drug trafficking. (Tr. 50).

According to the plaintiff, her constant worry led to anxiety, panic and atrial fibrillation. (Tr. 57). The plaintiff testified that she had had atrial fibrillation for at least three years and that her atrial fibrillation had resulted in multiple visits to the ICU. (Tr. 56). The plaintiff also reported having chronic obstructive pulmonary disease ("COPD") which she described as "horrible" and stated that her "breathing [was] very bad." (Tr. 59-60).

The plaintiff took the following medications: Zoloft for depression, Gabapentin for mood swings and circulation problems, Metoprolol for atrial fibrillation,[10] Lisinopril for hypertension, and Omeprazole for gastrointestinal reflux disease. (Tr. 53-55). The plaintiff reported no major side effects from taking Zoloft, Gabapentin, Metoprolol, or Lisinopril. (Tr. 55). The plaintiff also reported taking Chantix to help the plaintiff quit smoking. (Tr. 60).[11]

The plaintiff experienced depression, mood swings, nightmares, and sleepless nights. (Tr. 58). She stated that alcohol was a "big problem" in her life. Id. At the "worst point," approximately one year prior to the hearing, the plaintiff would drink a 12-pack of beer a day. (Tr. 59). She also acknowledged that she had experimented with powder and crack cocaine but stated that it had been years since she had last used those drugs. (Tr. 59).

The plaintiff testified that she and her companion lived in a motel room. (Tr. 61). The plaintiff would stay in the motel room all day and watch television while her

---

[10] The plaintiff reported taking a second medication for her atrial fibrillation but could not recall the name of that medication. (Tr. 56).

[11] At the time of the hearing, the plaintiff was smoking a pack of cigarettes a day and had been on Chantix for two days. (Tr. 60, 63).

companion worked six days a week. Id. The plaintiff testified that she would not eat during the day and would eat when her companion came home in the evenings with takeout. (Tr. 68-69). The plaintiff also waited until her companion came home to bathe herself due to a fear of falling. (Tr. 68). For entertainment, the plaintiff and her companion played cards, watched sports on Sundays, and listened to music together. (Tr. 65).

The plaintiff stated that she could not go outside because of the heat and her breathing difficulties. (Tr. 61). The plaintiff always felt tired. (Tr. 58).  She would "get out of breath easy" and "feel weak" from getting up and going to the bathroom. (Tr. 65). She lacked the energy to do laundry and had not grocery shopped in at least two years. (Tr. 58, 63-64).

The plaintiff testified that she would try not to go out during the day, including to the front desk of the motel, which was approximately 50 feet away because she would "get totally exhausted." (Tr. 66). The plaintiff testified that it would take her a minute or two to walk 50 feet and could walk for a minute or two without having to change positions. Id. Sometimes she would "rest at the step and then go up." Id. The plaintiff also reported being able to stand for five to ten minutes without changing position and she was comfortable sitting for an unlimited period of time. Id.

### B.    VE's Testimony

The ALJ also heard testimony from a VE. (Tr. 70-78). The VE classified the

plaintiff's past relevant work[12] as a telemarketer as semi-skilled with a sedentary

exertional level and a specific vocational preparation ("SVP")[13] level 3. (Tr. 70).

The ALJ posed three hypotheticals to the VE. The ALJ posed the following first

hypothetical to the VE:

> [A]ssuming a hypothetical Claimant who has the same age, educational
> background, and vocational history as Ms. Wines, and assuming that this
> hypothetical Claimant has no exertional limitation. And this hypothetical
> Claimant has no postural limitations for hypothetical #1, no manipulative
> limitations; however, with respect to environmental limitation . . . this
> hypothetical Claimant is unlimited with respect to exposure to extreme
> cold with respect to exposure to noise, with respect to exposure to
> vibration, and with respect to exposure to hazards. However, this
> hypothetical Claimant can only have frequent exposure to extreme heat,
> wetness, humidity, and environmental irritants and pulmonary irritants,
> including dust, odors, and fumes. With respect to mental limitations, this
> hypothetical Claimant can have unlimited interaction with supervisors but
> only frequent interaction with coworkers and only frequent interaction with
> the public. Would this hypothetical Claimant be able to perform any of the
> past relevant work of Ms. Wines?

(Tr. 71, 73). In response to the ALJ's first hypothetical, the VE testified that the

hypothetical individual would be able to perform the plaintiff's past relevant work.

(Tr. 73).

The ALJ posed the following second hypothetical to the VE:

> [I]n hypothetical #2, hypothetical #2 has the same exertional limitation,
> postural limitations, and manipulative limitations as hypothetical #1, the
> same environmental limitations, but in hypothetical #2, this hypothetical
> Claimant is limited to simple, routine tasks that can be learned in 30 days

---

[12] In his decision, the ALJ determined that the plaintiff had no past relevant work. (Tr. 22).

[13] SVP is defined in the Dictionary of Occupational Titles ("DOT") as "the amount of lapsed time required
by a typical worker to learn the techniques, acquire the information, and develop the facility needed for
average performance in a specific job-worker situation." See Dictionary of Occupational Titles, Appendix
C: Components of the Definition Trailer, § II (4th ed., rev. 1991).

or less. This hypothetical Claimant can have only frequent interaction with supervisors, frequent interaction with coworkers, and frequent interaction with the public. However, this hypothetical Claimant in hypothetical #2 should have no tasks involving the safety or welfare of others. Would this hypothetical Claimant in #2 be able to perform any of the past relevant work of Ms. Wines?

(Tr. 73-74). In response to the ALJ's second hypothetical, the VE testified that the individual in the second hypothetical could not perform any of the plaintiff's past relevant work. (Tr. 74). Nonetheless, the VE testified that there were other jobs in the national economy that this hypothetical person could perform such as store laborer of which there were 60,000 jobs in the national economy, laundry laborer of which there were 50,000 jobs in the national economy and hand packager of which there were 40,000 jobs in the national economy, all with an SVP level 2. Id.

The VE testified that his responses to the first and second hypotheticals were "based on the Dictionary of Occupational Titles." (Tr. 77-78). [14]

## THE ALJ'S DECISION-MAKING PROCESS

"Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The impairment(s) must be severe, making the plaintiff "unable to do his previous work . . . or any other kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C. § 423(d)(2)(A).

---

[14] The ALJ posed a third hypothetical, which the VE responded to based on his "education and training in the areas of job development and job placement." (Tr. 77). That hypothetical is not at issue here.

To determine whether the plaintiff is entitled to disability benefits, the ALJ must apply a five-step analysis. 20 C.F.R. § 404.1520(a). The ALJ must first determine whether the plaintiff is engaging in substantial gainful activity ("SGA"). 20 C.F.R. § 404.1520(b). If so, a finding of non-disability is made, and the inquiry ends. Id.

Second, the ALJ must determine whether the plaintiff suffers from a severe impairment or a combination of impairments. If the plaintiff does not, then a finding of non-disability is made, and the inquiry ends. 20 C.F.R. § 404.1520(c).

Third, the ALJ compares the plaintiff's severe impairments to the impairments listed in Appendix I to Subpart 404 of the Code of Federal Regulations. 20 C.F.R. § 404.1520(d), Subpart P, Appendix I.[15] If the impairment meets or equals a listed impairment, disability is presumed, and benefits are awarded. 20 C.F.R. § 404.1520(d). If it does not, the analysis proceeds to the next step.

Fourth, the ALJ must determine whether the plaintiff has the residual functional capacity ("RFC") to perform his or her past relevant work. 20 CFR 404.1520(f). RFC is defined as "the most [a claimant] can still do despite [his or her] limitations." 20 C.F.R. § 404.1545(a)(1). This determination considers "all relevant evidence," including medical evidence, the claimant's own testimony and the observations of others. Id. If the plaintiff is unable to perform his or her past relevant work, then a prima facie case of disability is established and the burden of proof shifts to the Commissioner to show at step five that there is other work available in the national economy which the plaintiff

---

[15] "Certain impairments are so severe either when considered alone or in conjunction with other impairments that, if such impairments are proved, the regulations require a finding of disability without further inquiry into the claimant's ability to work." Gibson v. Heckler, 762 F.2d 1516, 1518 n.1 (11th Cir. 1985).

can perform. <u>Washington v. Comm'r of Soc. Sec.</u>, 906 F.3d 1353, 1359 (11th Cir. 2018); 20 C.F.R. § 404.1520(e)-(f).

Fifth, the ALJ must consider the plaintiff's RFC, age, education, and work experience and determine whether the plaintiff "can make an adjustment to other work." <u>Phillips v. Barnhart</u>, 357 F.3d 1232, 1239 (11th Cir. 2004) (quoting 20 C.F.R. § 404.1520(a)(4)(v)). If the plaintiff can make an adjustment to other work, a finding that the plaintiff is not disabled is made. In other words, if the plaintiff cannot perform her past relevant work, the ALJ must decide if she can perform any other work that exists in the national economy using either the Medical Vocational Guidelines or through the testimony of a VE. <u>Id.</u> at 1239-40.

## THE ALJ'S DECISION

The ALJ issued his decision on December 6, 2018. (Tr. 15-24). The ALJ found that the plaintiff met the insured status requirements of the Social Security Act through March 31, 2008. (Tr. 18). Nonetheless and for the reasons discussed below, the ALJ determined that the plaintiff was not "under a disability within the meaning of the Social Security Act from [the amended alleged onset date of] December 21, 2015, through the date of [the ALJ's] decision," December 6, 2018. (Tr. 16).

At step one, the ALJ found that the plaintiff had not engaged in substantial gainful activity since December 21, 2015. (Tr. 18).

At step two, the ALJ determined that the plaintiff had the severe impairments of chronic liver disease, affective disorder, and anxiety disorder. (Tr. 18). The ALJ also found that the plaintiff had a history of other unspecified arthropathy, chronic pulmonary insufficiency, alcohol and substance addiction disorder and hypertension. <u>Id.</u> However,

the ALJ found that these additional impairments were non-severe impairments and did not cause the plaintiff "more than minimal functional limitation in her ability to perform work activities." Id. The ALJ noted that the plaintiff's physical examinations were essentially normal, she had stable blood pressure, a normal range of motion in her extremities and no edema or deformities. Id. With respect to the plaintiff's alcohol and substance addiction, the ALJ noted that the plaintiff had undergone detoxification and that her condition had been stable when she was discharged from the hospital. Id.

At step three, the ALJ found that the plaintiff "[did] not have an impairment or combination of impairments that [met] or medically equal[ed] the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. § 404.1520(d), 404.1525, 416.920(d), 416.925, and 416.926)." (Tr. 18). The ALJ stated that in reaching his conclusion, he had considered all listed impairments including digestive system disorders and mental disorders. Id.

The ALJ found that the plaintiff's "mental impairments considered singly and in combination, [did] not meet or medically equal the criteria of listings 12.04 and 12.06." (Tr. 18). The ALJ explained that in making this determination, he "ha[d] considered whether the 'paragraph B' criteria [were] satisfied." Id.[16] The ALJ noted that:

> To satisfy the "paragraph B" criteria, the mental impairments must result in at least one extreme or two marked limitations in a broad area of functioning which are: understanding, remembering, or applying

---

[16] As one court explained:

> The paragraph B criteria refers to the degree of the claimant's ability to function independently, appropriately, effectively, and on a sustained basis in the four broad areas of functioning which are: understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; or adapting or managing themselves. The degree of limitation in the "B" criteria is rated on a five-point scale: "none," "mild," "moderate," "marked," and "extreme" (20 CFR 416.920a(c)(4)).

Powell v. Saul, No. 3:18CV1488 (AWT), 2020 WL 1329696, at *2 (D. Conn. Mar. 23, 2020).

> information; interacting with others; concentrating, persisting, or
> maintaining pace; or adapting or managing themselves. A marked
> limitation means functioning in this area independently, appropriately,
> effectively, and on a sustained basis is seriously limited. An extreme
> limitation is the inability to function independently, appropriately or
> effectively, and on a sustained basis.

Id. The ALJ determined that the paragraph B criteria had not been met because the plaintiff's impairments did not satisfy at least two "marked" limitations or one "extreme" limitation. (Tr. 19).

Specifically, the ALJ found that the plaintiff did not have a limitation in understanding, remembering, or applying information and cited plaintiff's ability to recite six digits forward and three digits backward, her ability to perform simple addition and subtraction, and the treatment notes from Citrus Health Network indicating that the plaintiff's memory was grossly intact. (Tr. 18-19). The ALJ further found that the plaintiff had moderate limitation in interacting with others. (Tr. 19). The ALJ noted plaintiff's cooperative behavior at the consultive examination, the cooperative and organized behavior cited in the treatment notes from Citrus Health Network, and the appropriate behavior displayed by the plaintiff throughout the administrative hearing. Id.

The ALJ also found that the plaintiff had moderate limitation in concentrating, persisting, or maintaining pace and noted the plaintiff's ability to perform simple math calculations, the plaintiff's fair attention and concentration at the consultative examination, the plaintiff's ability to follow the court proceedings, and the plaintiff's ability to provide meaningful testimony at the administrative hearing. (Tr. 19). Lastly, the ALJ found that the plaintiff had mild limitation in adapting or managing herself and noted that the plaintiff was able to care for her cats, attend medical appointments, watch

television, care for her own personal needs and appeared "fairly kept" with respect to her grooming and hygiene. Id.

The ALJ also considered the paragraph C criteria[17] and found they had not been met:

> The record is devoid [of] evidence of a medically documented history of the existence of a "serious and persistent" mental disorder, over a period of at least two years, with evidence of both of the following: medical treatment, mental health therapy, psychological support(s), or a highly structured setting(s) that is ongoing and that diminishes the symptoms and signs of the mental disorder; and marginal adjustment, that is, having minimal capacity to adapt to changes in [one's] environment or to demands that are not already part of [one's] daily life.

(Tr. 19).

The ALJ found that the plaintiff "ha[d] the residual functional capacity to perform a full range of work at all exertional levels but with the following non-exertional limitations: the claimant could tolerate frequent exposure to extreme heat, wetness, humidity, and environmental irritants such as dusts, odors, fumes, and pulmonary irritants" and that the plaintiff could "frequently interact with coworkers and the public," but "could never perform tasks involving the safety or welfare of others." (Tr. 20).

The ALJ found that the plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms." (Tr. 21). Nonetheless, the

---

[17] The Paragraph C criteria are satisfied where there is:

> a medically documented chronic affective disorder of at least 2 years' duration, with at least one of the following: (1) repeated episodes of decompensation, each of extended duration; (2) a residual disease process that resulted in such a marginal adjustment that even a minimal increase in mental demands of change in the environment would be predicted to cause the individual to decompensate; or (3) a current history of one or more years' inability to function outside a highly supportive living environment.

McClinton v. Colvin, No. 13CV8904 CM MHD, 2015 WL 6117633, at *12, n.60 (S.D.N.Y. Oct. 16, 2015) (report and recommendation) (citing 20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 12.04(C), 12.06(C)).

statements made by the plaintiff "concerning the intensity, persistence and limiting effects of these symptoms [were] not entirely consistent with the medical evidence and other evidence in the record." Id. The ALJ cited the plaintiff's ability to care for her cats, attend medical appointments, watch television, and care for her own personal needs. (Tr. 22). Further, the ALJ noted that the medical evidence showed that the plaintiff's treatment had been generally successful in controlling the plaintiff's symptoms. Id. The ALJ cited the medical records from the Citrus Health Network which showed the plaintiff's symptoms were stabilized with medication and treatment. Id.

At step four, the ALJ found that the plaintiff had no past relevant work. (Tr. 22).

At step five, the ALJ considered the plaintiff's age, education, work experience, and RFC to determine whether there were jobs in the national economy which the plaintiff could perform. (Tr. 22). The ALJ relied on the VE's testimony in concluding that given the plaintiff's age, education, work experience, and RFC, the plaintiff was "capable of making a successful adjustment to other work that exist[ed] in significant numbers in the national economy," such as store laborer, laundry laborer, and hand packager. (Tr. 23). Therefore, the ALJ found that the plaintiff was "not disabled under sections 216(i) and 223(d) of the Social Security Act." (Tr. 24).

## **STANDARD OF REVIEW**

The decision made by the Commissioner of Social Security is conclusive if supported by substantial evidence and if the correct legal standards were applied. Kelley v. Apfel, 185 F.3d 1211, 1213 (11th Cir. 1999) (per curiam). "Substantial evidence is more than a scintilla, but less than a preponderance" of the evidence and is generally defined as such relevant evidence which a reasonable mind would accept as

adequate to support a conclusion. <u>Miles v. Chater</u>, 84 F.3d 1397, 1400 (11th Cir. 1996). In determining whether substantial evidence exists, the "court must view the record as a whole, taking into account evidence favorable as well as unfavorable to the decision." <u>Foote v. Chater</u>, 67 F.3d 1553, 1560 (11th Cir. 1995).

Judicial review of the factual findings in a disability case is limited to determining whether the record contains substantial evidence to support the Commissioner's factual findings. 42 U.S.C. § 405(g) (stating that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive"). A reviewing court may not re-weigh the evidence or substitute its discretion for the discretion of the Commissioner. <u>Wolfe v. Chater</u>, 86 F.3d 1072, 1076 (11th Cir. 1996).

This deferential standard of review applies only to findings of fact and no presumption of validity attaches to the Commissioner's legal conclusions. <u>See</u> <u>Cornelius v. Sullivan</u>, 936 F.2d 1143, 1145 (11th Cir. 1991) ("We review the Secretary's decision with deference to the factual findings and close scrutiny of the legal conclusions."). A reviewing court must remand where the Commissioner fails "to apply the correct law or to provide the reviewing court with sufficient reasoning for determining that the proper legal analysis has been conducted . . . ." <u>Id.</u> at 1145-46.

## **ANALYSIS**

The plaintiff seeks an order remanding the case to the ALJ based on the following grounds: (1) the ALJ failed to satisfy the Commissioner's burden at step five of establishing that other jobs existed in significant numbers in the national economy that the plaintiff could perform; (2) the ALJ's RFC finding was not supported by substantial

evidence; and (3) the ALJ failed to properly assess the plaintiff's alleged symptoms and limitations. Pl.'s Br. at 13-21.[18] For the reasons discussed below, the undersigned finds that a remand is not warranted in this matter.

**I.     The ALJ's Finding at Step Five That the Plaintiff Is Able to Do Other Work in the National Economy Is Supported by Substantial Evidence**

The plaintiff argues that the ALJ failed to satisfy the Commissioner's burden at step five of establishing that other jobs existed in significant numbers in the national economy that the plaintiff could perform. Pl.'s Br. at 13-16. The defendant asserts that "the ALJ properly relied on VE testimony that included a significant number of jobs in the national economy." Def.'s Br. at 14 (citations omitted).

At the administrative hearing, the ALJ posed the following first hypothetical to the VE:

> [A]ssuming a hypothetical Claimant who has the same age, educational background, and vocational history as Ms. Wines, and assuming that this hypothetical Claimant has no exertional limitation. And this hypothetical Claimant has no postural limitations for hypothetical #1, no manipulative limitations; however, with respect to environmental limitation . . . this hypothetical Claimant is unlimited with respect to exposure to extreme cold with respect to exposure to noise, with respect to exposure to vibration, and with respect to exposure to hazards. However, this hypothetical Claimant can only have frequent exposure to extreme heat, wetness, humidity, and environmental irritants and pulmonary irritants, including dust, odors, and fumes. With respect to mental limitations, this hypothetical Claimant can have **unlimited interaction with supervisors but only frequent interaction with coworkers and only frequent interaction with the public**. Would this hypothetical Claimant be able to perform any of the past relevant work of Ms. Wines?

---

[18] The Plaintiff's Motion for Summary Judgment (DE # 25, 09/28/2020) contains two sets of page numbers. The undersigned will cite to the page numbers automatically assigned by the Court's CM/ECF system which appear at the top, right-hand side of each page.

(Tr. 71, 73) (emphasis added). In response to the ALJ's first hypothetical, the VE testified that the hypothetical individual would be able to perform the plaintiff's past relevant work, which the VE had classified as a telemarketer, a semi-skilled position with a sedentary exertional level and an SVP level 3. (Tr. 70, 73).

In the second hypothetical, the ALJ asked the VE whether a hypothetical individual with:

> the same exertional limitation, postural limitations, and manipulative limitations as hypothetical #1, the same environmental limitations, but in hypothetical #2**, this hypothetical Claimant is limited to simple, routine tasks that can be learned in 30 days or less**. This hypothetical Claimant **can have only frequent interaction with supervisors**, **frequent interaction with coworkers, and frequent interaction with the public. However, this hypothetical Claimant in hypothetical #2 should have no tasks involving the safety or welfare of others**. Would this hypothetical Claimant in #2 be able to perform any of the past relevant work of Ms. Wines?

(Tr. 73-74) (emphasis added). The VE testified that the individual in the second hypothetical could not perform any of the plaintiff's past relevant work as a telemarketer (SVP level 3). (Tr. 74). However, the individual in the second hypothetical could perform the work of store laborer, laundry laborer and hand packager, all unskilled jobs with an SVP level 2. Id.

In his decision, the ALJ found that the plaintiff:

> ha[d] the residual functional capacity to perform a full range of work at all exertional levels but with the following non-exertional limitations: the [plaintiff] could tolerate frequent exposure to extreme heat, wetness, humidity, and environmental irritants such as dusts, odors, fumes, and pulmonary irritants. **She could frequently interact with coworkers and the public. Additionally, the [plaintiff] could never perform tasks involving the safety or welfare of others**.

(Tr. 20) (emphasis added).

At step five, the ALJ stated that "[b]ased on the testimony of the vocational expert," he "conclude[d] that, considering the claimant's age, education, work experience, and residual functional capacity, the claimant [was] capable of making a successful adjustment to other work that exist[ed] in significant numbers in the national economy." (Tr. 23).

The plaintiff argues that the ALJ erred at step five, when he relied on the VE's testimony in response to the second hypothetical—that the individual in the second hypothetical "could perform the jobs of store laborer, laundry laborer, and hand packager"—because these jobs "[did] not match a hypothetical question with the exact set of limitations the ALJ relied upon in his RFC finding." Pl.'s Br. at 14.[19]

The plaintiff also argues that the VE's testimony that the individual in the second hypothetical "could perform the jobs of store laborer, laundry laborer, and

---

[19] The plaintiff notes the distinctions between the limitations included in the ALJ's first and second hypotheticals and the ALJ's RFC determination:

the ALJ's first hypothetical question to the Vocational Expert did not contain a limitation to never perform tasks involving the safety or welfare of others [(Tr. 71, 73)], but his ultimate RFC finding did [(Tr. 20)]. And the ALJ's second hypothetical question to the Vocational Expert contains limitations to simple, routine tasks that can be learned in 30 days or less, as well as to frequent interaction with supervisors [(Tr. 73-74)], whereas his ultimate RFC finding does not [(Tr. 20)].

\*\*\*

[T]he ALJ's ultimate RFC finding contains one additional limitation found in the second hypothetical question, but excludes two others also in the same second hypothetical question. . . . [T]he ALJ's RFC finding is not an exact reflection of his first hypothetical question because it contains the additional limitation to never perform tasks involving the safety or welfare of others, which is found in his second hypothetical question. But then why does his RFC finding exclude the two other limitations in his second hypothetical question, those of frequent interaction with supervisors and simple, routine tasks that can be learned in 30 days or less? The exclusion of the latter of these two without any reasonable explanation is critical in this case because all of the jobs named by the VE have Reasoning Level requirements that plainly exceed the capacity of an individual who is limited to "simple, routine tasks."

Pl.'s Br. at 14. (emphasis omitted).

hand packager" was "entirely inconsistent with the information contained in the DOT." Pl.'s Br. at 15. The plaintiff notes that the jobs listed by the VE in response to the second hypothetical were all reasoning 2 jobs, which "require an individual be able to '[a]pply commonsense understanding to carry out detailed but uninvolved written or oral instructions,'" but the second hypothetical was limited to "simple, routine tasks that [could] be learned in 30 days or less." Id.; (Tr. 73).

The defendant maintains that the "[t]he ALJ posed a hypothetical question to the VE that contained all of the limitations in Plaintiff's RFC." Def.'s Br. at 8. The defendant notes that the ALJ's second hypothetical to the VE:

> included the following limitations[,] frequent exposure to extreme heat, wetness, humidity, and environmental and pulmonary irritants, including dust, odors, and fumes; only frequent interaction with coworkers, the public, and supervisors; **simple, routine tasks that can be learned in 30 days or less**; and no tasks involving the safety or welfare of others.

Id. at 10 (citing (Tr. 73-74) (emphasis added)). The defendant asserts that the fact that the ALJ's second hypothetical contained an additional limitation of "simple, routine tasks" is of no consequence because "the ALJ's RFC finding did not include this particular limitation" and "even if the ALJ had included a limitation to simple, routine tasks in the RFC, there would be no apparent conflict between this and the reasoning levels of the jobs identified by the VE." Id.

The defendant further asserts that there is no apparent conflict between the VE's testimony and the DOT. Def.'s Br. at 10. The defendant argues that "simple, routine and repetitive tasks [are] not inconsistent with a reasoning level 2 job." Id. (citing Valdez v. Comm'r of Soc. Sec., 808 F. App'x 1005 (11th Cir. 2020)). The defendant cites the DOT

definition of reasoning level 2[20] and argues that "[t]hese DOT requirements align with— rather than conflict with— the limitation to 'simple, routine' tasks." Id. at 11.

An ALJ has an affirmative duty to identify and resolve apparent conflicts between DOT data and VE testimony. Washington v. Comm'r of Soc. Sec., 906 F.3d 1353, 1356 (11th Cir. 2018). An "apparent conflict" is defined as

> more than just a conflict that is made apparent by the express testimony of the VE. It is a conflict that is reasonably ascertainable or evident from a review of the DOT and the VE's testimony. At a minimum, a conflict is apparent if a reasonable comparison of the DOT with the VE's testimony suggests that there is a discrepancy, even if, after further investigation, that turns out not to be the case.

Id. The ALJ must do more than simply ask the VE whether his testimony is consistent with the DOT. Id. "When an apparent conflict arises, the ALJ must offer a reasonable explanation for the discrepancy, and detail in his decision how he has resolved the conflict." Id. If the ALJ fails to identify and resolve any apparent conflicts, then the ALJ's decision is not supported by substantial evidence. Id.

Recently, the Eleventh Circuit decided Buckwalter v. Acting Comm'r of Soc. Sec., 997 F.3d 1127 (11th Cir. 2021). One of the issues raised in Buckwalter was "whether there [was] an apparent conflict between one's limitation to following simple instructions and positions that require the ability to follow 'detailed but uninvolved' instructions." Id. at 1131. Consistent with decisions in the Fourth Circuit and the Eighth Circuit,[21] the Eleventh Circuit held that no apparent conflict existed: "[t]here is not an apparent conflict here between [the plaintiff's] RFC, which limits her to the ability to 'understand, carry-

---

[20] The DOT defines reasoning level 2 as requiring a worker to "[a]pply commonsense understanding to carry out detailed but uninvolved written or oral instructions" and "[d]eal with problems involving a few concrete variables in or from standardized situations." DOT § 209.587-010, 1991 WL 671797.

[21] Lawrence v. Saul, 941 F.3d 140 (4th Cir. 2019); Moore v. Astrue, 623 F.3d 599 (8th Cir. 2010).

out, and remember simple instructions,' and the identified positions with a reasoning level of two." Id. at 1134. The Eleventh Circuit acknowledged that "[w]hile it [was] a close question, the two terms [could] be readily reconciled." Id.

In the instant case, the limitation of "simple routine tasks that can be learned in 30 days or less" was included in the second hypothetical to the VE, (Tr. 73), but was not included in the RFC which stated that:

> the claimant ha[d] the residual functional capacity to perform a full range of work at all exertional levels but with the following non-exertional limitations: the claimant could tolerate frequent exposure to extreme heat, wetness, humidity, and environmental irritants such as dusts, odors, fumes, and pulmonary irritants. She could frequently interact with coworkers and the public. Additionally, the claimant could never perform tasks involving the safety or welfare of others.

(Tr. 20). Nonetheless, even if the ALJ erred in omitting this limitation from his RFC determination, it was harmless error because the VE's testimony in response to the second hypothetical—that there were jobs in the national economy (store laborer, laundry laborer, and hand packager)—took into account a hypothetical claimant who "[was] limited to simple, routine tasks that [could] be learned in 30 days or less." (Tr. 73). For the reasons stated in Buckwalter, there is no apparent conflict between a reasoning level 2 job (store laborer, laundry laborer, and hand packager) and a limitation to simple, routine, repetitive tasks. Buckwalter, 997 F.3d at 1134.

Based on the foregoing the undersigned concludes that the ALJ's finding at step five that the plaintiff is able to do other work in the national economy is supported by substantial evidence.

II.     **The ALJ's RFC Determination Does Not Warrant a Remand**

The plaintiff further argues that the ALJ's RFC finding was not supported by substantial evidence because it "[did] not adequately account for [the plaintiff's] 'moderate' limitation in her ability to concentrate, persist, or maintain pace." Pl.'s Br. at 17. The defendant responds that the ALJ's RFC finding does not warrant a remand because the ALJ's hypothetical incorporated limitations and found that the plaintiff could perform several unskilled jobs. Def's Br. at 14-15.

An ALJ "will assess [a claimant's] residual functional capacity based on all of the relevant medical and other evidence." 20 C.F.R. § 404.1545(a)(3). In <u>Winschel v. Comm'r of Soc. Sec.</u>, the Eleventh Circuit held that "[b]ecause the ALJ asked the vocational expert a hypothetical question that failed to include or otherwise implicitly account for all of [the plaintiff]'s impairments, the vocational expert's testimony [was] not substantial evidence and [could not] support the ALJ's conclusion that [the plaintiff] could perform significant numbers of jobs in the national economy." 631 F.3d 1176, 1181 (11th Cir. 2011) (internal quotation marks omitted). The Eleventh Circuit observed that:

> Other circuits have also rejected the argument that an ALJ generally accounts for a claimant's limitations in concentration, persistence, and pace by restricting the hypothetical question to simple, routine tasks or unskilled work. . . . **But when medical evidence demonstrates that a claimant can engage in simple, routine tasks or unskilled work despite limitations in concentration, persistence, and pace, courts have concluded that limiting the hypothetical to include only unskilled work sufficiently accounts for such limitation**s.

<u>Id.</u> at 1180 (citations omitted; emphasis added).

Here, the ALJ's RFC determination is supported by substantial evidence in the record. The ALJ found that the plaintiff had a moderate limitation in regard to

concentrating, persisting, or maintaining pace, after reviewing the consultative examination, the treatment notes from Citrus Health Network, and observing the plaintiff's ability to follow administrative proceedings and provide meaningful testimony at the hearing. (Tr. 19). The ALJ implicitly accounted for the plaintiff's moderate limitation in concentration, persistence, and pace by including in the second hypothetical a limitation of "simple, routine tasks that can be learned in 30 days or less." (Tr. 73). The VE's response to the second hypothetical listed several unskilled jobs which a hypothetical individual with those limitations could perform. (Tr. 74).

In <u>Washington v. Soc. Sec. Admin., Com'r</u>, the Eleventh Circuit found that

**[t]he ALJ . . . explicitly and implicitly took into account [the plaintiff]'s moderate limitations in maintaining concentration, persistence, or pace by including the restrictions that [the plaintiff] was limited to performing only simple, routine repetitive tasks with up to three-step demands, and only occasional changes in the work setting, judgment, or decision making.**

503 F. App'x 881, 883 (11th Cir. 2013) (emphasis added). The Eleventh Circuit reasoned that "[b]ecause the evidence showed that [the plaintiff] could perform simple, routine tasks, the ALJ's hypothetical question to the VE which included this limitation adequately addressed [the plaintiff]'s limitations as to concentration, persistence, or pace." <u>Id.</u> Similarly here, the ALJ considered the plaintiff's moderate limitation with regard to concentration, persistence, and pace and accounted for that limitation in his second hypothetical to the VE by including a limitation of "simple, routine tasks that can be learned in 30 days or less." (Tr. 73).

Based on the foregoing the undersigned concludes that the ALJ's RFC determination and his reliance on the VE's testimony to find that there were other jobs in

significant numbers in the national economy that the plaintiff could perform does not warrant a remand.

### III.    The ALJ's Assessment of the Plaintiff's Symptoms and Limitations is Supported by Substantial Evidence

Lastly, the plaintiff argues that the ALJ failed to properly assess the plaintiff's alleged symptoms and limitations. Pl.'s Br. at 18-21. The plaintiff states that "allegations regarding her symptoms and limitations have been remarkably consistent with the medical evidence of record throughout the entirety of the claims process . . . and the ALJ did not provide the requisite good cause for discounting them." Id. at 21. The defendant asserts that "the ALJ properly evaluated the record as a whole and concluded that in light of [the plaintiff's] longitudinal medical history, and treatment history, she could perform within the range of work set forth in the highly restrictive RFC finding." Def's Br. at 20 (citing (Tr. 20)).

The applicable regulation states that:

> In determining whether [a claimant is] disabled, [the ALJ will] consider all [of the claimant's] symptoms, including pain, and the extent to which [the claimant's] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence. [The ALJ] will consider all of [the claimant's] statements about [his or her] symptoms, such as pain, and any description [the claimant's] medical sources or nonmedical sources may provide about how the symptoms affect [his or her] activities of daily living and [the claimant's] ability to work. However, statements about [t the claimant's] pain or other symptoms will not alone establish that [the claimant is] disabled.

20 C.F.R. § 404.1529(a).

To demonstrate disability based on a claimant's subjective complaints, the claimant must provide evidence of the medical condition triggering the claimant's alleged symptoms. See 20 C.F.R. § 404.1529(a), (b). The claimant must either: (a)

provide objective medical evidence confirming the severity of the claimant's alleged symptoms; or (b) show that the claimant's objectively determined medical condition could reasonably be expected to cause the claimant's alleged symptoms. Id. If the objective medical evidence shows that the medically determined impairment could reasonably be expected to produce the claimant's alleged symptoms, the ALJ must then evaluate the intensity and persistence of the symptoms to determine whether the claimant's alleged symptoms limit the claimant's capacity to work. See 20 C.F.R. § 404.1529(c), (d). The ALJ must not reject statements about the intensity and persistence of the plaintiff's alleged symptoms solely because the objective medical evidence does not substantiate the plaintiff's statements. 20 C.F.R. § 404.1529(c). The ALJ will consider any inconsistencies between the objective medical evidence and the plaintiff's subjective statements. 20 C.F.R. § 404.1529(c).

Here, the ALJ cited to the medical evidence that showed the medical treatment received by the plaintiff had been generally successful in controlling the plaintiff's symptoms and the plaintiff's symptoms were stabilized with medication and treatment. (Tr. 22). Further, the ALJ found that the testimony and statements of the plaintiff were inconsistent with the substantial evidence in the record. (Tr. 21). The ALJ noted the plaintiff's ability to care for her pets, attend medical appointments, watch television, and care for her own personal needs. (Tr. 21-22). Substantial evidence in the record is inconsistent with the plaintiff's subjective suggestion that her symptoms were so severe as to preclude her ability to work. Accordingly, the undersigned finds that the ALJ correctly assessed the plaintiff's subjective complaints.

Based on the foregoing the undersigned concludes that the ALJ's assessment of the plaintiff's symptoms and limitations is supported by substantial evidence.

## **RECOMMENDATION**

Based on the foregoing, the undersigned respectfully RECOMMENDS that the Defendant's Motion for Summary Judgment (DE # 26, 10/28/2020) be **GRANTED** and that the Plaintiff's Motion for Summary Judgment (DE # 25, 09/28/2020) be **DENIED**.

The parties have fourteen (14) days from the date of receipt of the report and recommendation within which to serve and file written objections, if any, with the United States District Court Marcia G. Cooke. Failure to file timely objections shall bar the parties from a de novo determination by the District Judge of an issue covered in the Report and Recommendation and shall bar the parties from attacking on appeal the unobjected-to factual and legal conclusions contained in this Report, except on the grounds of plain error if necessary in the interest of justice. See 28 U.S.C. § 636(b)(1); Harrigan v. Metro Dade Police Dep't Station #4, 977 F.3d 1185, 1191-92 (11th Cir. 2020); Thomas v. Arn, 474 U.S. 140, 149 (1985); Henley v. Johnson, 885 F.2d 790, 794 (1989); 11th Cir. R. 3-1 (2019).

RESPECTFULLY SUBMITTED at the United States Courthouse, Miami, Florida this **29th** day of June, 2021.

JOHN J. O'SULLIVAN
CHIEF UNITED STATES MAGISTRATE JUDGE